2021 IL App (2d) 190699-U
No. 2-19-0699
Order filed October 27, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 03-CF-1233 |
| EFRAIN V. ORTEGA, | ) ) ) | Honorable Mark L. Levitt, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Hutchinson and Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's conviction for predatory criminal sexual assault of a child is reversed and vacated because the indictment was fatally defective. Defendant's trial counsel provided ineffective assistance, and we reverse and remand for a new trial on the aggravated-criminal-sexual-abuse charges. Reversed and remanded.

¶ 2    After a jury trial, defendant, Efrain V. Ortega, was convicted of predatory criminal sexual assault of a child (720 ILCS 5/12-14.1(a)(1) (West 1996)) and aggravated criminal sexual abuse (720 ILCS 5/12-16(c)(1)(i) (West 1996)). He was sentenced to 13 years' imprisonment on the predatory-sexual-assault count, consecutive to concurrent 6-year terms on each of the aggravated-criminal-sexual-abuse counts. Defendant appeals, arguing that: (1) the indictment charged him for

a crime that did not exist for the entire period alleged; (2) his trial counsel was ineffective; (3) the trial court conducted an inadequate hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984) (hereinafter, *Krankel* hearing), on his *pro se* ineffective-assistance claims; and (4) the mittimus must be corrected to comport with the trial court's oral pronouncement of sentence and the proper mandatory supervised release (MSR) term. For the following reasons, we agree with defendant's first two arguments and need not address the second two. We reverse and remand.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. Indictment

¶ 5      On April 23, 2003, defendant was charged in a five-count indictment with offenses against his niece, T.R. Count I of the indictment alleged that defendant committed predatory criminal sexual assault of a child for placing his finger in T.R.'s vagina "between *January 1, 1998*, and March 31, 2003." (Emphasis added.) Count II alleged aggravated criminal sexual assault for placing his finger in T.R.'s vagina between January 1, 1996, and January 1, 1998;[1] this charge was *nolle prossed* before trial. Counts III-V charged defendant with aggravated criminal sexual abuse for touching T.R.'s vagina, breasts, and mouth with his tongue between January 1, 1996, and March 31, 2003.

¶ 6           B. Pretrial Proceedings and Oral Motion to Amend the Indictment

---

[1] According to defense counsel's later arguments, the grand jury questioned the date discrepancy between the counts for the same conduct, but the prosecutor explained that the difference related to the viability of the offense charged.

¶ 7     Although he initially appeared in court for some proceedings after being charged, defendant did not appear at an October 30, 2003, hearing or thereafter. Ultimately, he was arrested in 2016, *i.e.*, almost 13 years later, in Wisconsin, and extradited to Illinois.

¶ 8     Before trial, the State moved for a hearing pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2018)). At the hearing, the State called T.R.'s mother, Tanya R., who testified to a statement that T.R. made to her on April 5, 2003. During her testimony, Tanya explained that, on that date, her mother (T.R.'s grandmother) had telephoned, saying that she did not want to host Easter at her house, which she shared with defendant and his wife, Shelly Ortega (one of Tanya's sisters), because defendant had tried to "rape" D.E. (Tanya's 23-year-old sister). Defense counsel objected to that statement, but the objection was overruled. Tanya continued that she asked T.R. if defendant had ever done anything to her, and T.R. stated that he had and described him kissing her on the mouth, raising her shirt and kissing her on her stomach or at the bra line, and putting his hand inside her underwear. T.R.'s sister, C.R., related that defendant kissed her on the mouth and put his tongue in her mouth. Over objection, the court found T.R.'s statement to Tanya reliable and admissible.

¶ 9     In addition, the State moved *in limine* pursuant to section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2018)) for the introduction of other-crimes evidence. Specifically, the State asked to introduce evidence that defendant kissed T.R.'s younger sister, C.R., on the mouth and with his tongue, and grabbed D.E.'s breasts. Defense counsel objected. The court found both acts admissible but told counsel that it would be open to any defense suggestion to give the jury limiting instructions before or after hearing the evidence and, further, that "[o]f course, [defense counsel], it's always subject to your motion to strike if the State doesn't properly prove up anything."

¶ 10    On September 24, 2018, on the morning of trial, the State also orally moved to amend the indictment, specifically to change the date range alleged in count I. The following exchange occurred:

"STATE: Your Honor, prior to any argument on motions here, we'd ask to make an amendment to the indictment in regards to Count [I]. The date range being as amended to *July 1st, 1996* from 1998. I believe it's an error. There will be testimony regarding that date range. We ask that it be amended on its face to 1996.

THE COURT: And you object?

DEFENSE COUNSEL: Yes, Judge. And the reason that I object, Judge, is back on July 1st, 1996 *there was no such thing as a predatory criminal sexual assault*. It came in front of the legislature sometime in I would say 1999, 2000, Your Honor.

THE COURT: State?

STATE: Judge, it's our belief that the predatory criminal sexual assault statute was in effect at that time frame, and we have the statute from 1996.

THE COURT: All right. That's your objection. It's overruled. State will be allowed to amend over defendant's objection reflecting just the difference in the date based on the fact that the grand jury heard testimony consistent with what is contained in the indictment.

DEFENSE COUNSEL: Your Honor, I'm sorry, but you can't have the State amend an indictment that was previously determined through the grand jury in 2003. In fact, the grand jury had a lot of problems with that charge at that particular time[,] based on it being 1996[,] in 2003 when they brought their information. It's all in the grand jury transcripts.

Doing it at this particular time is not fair for this defendant and it's not fair for us to further proceed with that type of offense, Your Honor.

THE COURT: Okay. You want notice, as with [defendant], the date range of the alleged offenses. The fact that it was incorrectly written down on the indictment does not [in]validate the indictment. In fact, the case law is rather clear, especially with allegations concerning this type of victim. The State has given leave to make general allegations as long as they're served to put [defendant] on notice. I find everything that I've seen in the file on the common law record indicates that that was done appropriately. No prejudice to [defendant]. So your record is preserved, but your request is denied.

DEFENSE COUNSEL: Judge, *there was no crime. There was no crime in 1996*.

THE COURT: I take it that's what we're going to find out. \*\*\* " (Emphasis added.)

¶ 11                                C. Trial and Jury Instructions

¶ 12    As noted, the original indictment listed a date range for count I that commenced on January 1, 1998. In its oral motion, the State asked to amend that count so that the range would commence *July 1, 1996*. However, the indictment itself was *not* amended to fully comport with the requested change; rather, the indictment reflects only a handwritten notation crossing out "1998" and replacing it with "1996," such that the indictment reads "*January* 1, 1996." Before trial commenced, the indictment was read aloud to the jury using the January 1, 1996, date: "The defendant in this case is charged with the offenses of predatory criminal sexual assault of a child and aggravated criminal sexual abuse. More specifically, it is alleged that the defendant committed these offenses on or between *January 1st, 1996*[,] through March 31st of 2003[,] in Lake County." (Emphasis added.)

¶ 13    In opening statements, the State showed the jury a childhood photo of T.R., saying "[m]eet five-year-old [T.R.]  This is back in *1996*.  [T.R.] was *five years old*."  (Emphasis added.)  Defense counsel in opening statements noted that the State had referenced T.R. as being five years old in 1996.

¶ 14                              1. State's Case

¶ 15                                  a. T.R.

¶ 16    T.R. (age 26 at trial) testified that her birthday is January 19, 1992.  The State asked T.R., "I'd like to call your attention to around *1996/1997*.  You were between four and six years old; is that right?"  (Emphasis added.)  She agreed.  T.R. explained that her family lived in Texas during that period but came back to Illinois to visit her Aunt Shelly, defendant (Shelly's husband), and other relatives during summer vacation and for a few weeks as Christmas vacation.  The kids would stay with Shelly and defendant, while the parents stayed with other family.  T.R. agreed with the State's assertion that defendant molested her when she was around five years old and explained that she remembered that she was five years old because "We had been living in Laredo. We had moved there when I just started kindergarten, so I was five years old.  It was during summer vacation when we had come back and stayed with them for two years."  The State asked her what happened:

> "T.R.:  One morning my brother and my sister were playing in the living room.  My aunt was in the kitchen.  And [defendant] was in the bedroom, so sleeping I assumed.  And my aunt asked me to go in there with him to watch TV.  And *I said I didn't want to.  I didn't want to be in there alone with him.  And I told her I didn't want to go.*  And she told me if I didn't go in there, that I'd have to go home and I told her okay.  She told me she was going to call my parents and come pick me up.  So I went outside of the apartment

door. They lived on the second or third floor. And I sat on the stairs waiting for my parents to come pick me up because I didn't want to go. And she came back outside of the apartment and she said to come inside and she said if I didn't go in there with him, that she was going to punish me.

STATE: Why didn't you want to go into the bedroom where the defendant was?

T.R.: He scared me. I didn't like him. I knew that *he yelled at my aunt a lot. He always started to hit me with a whip that he had hanging in the living room.* And whenever my aunt would punish me, she always said that it was because he told her to because he made her." (Emphasis added.)

¶ 17    T.R. eventually went into the bedroom. She testified that defendant was lying in bed underneath the covers, and a children's show was on the television. The room was dark. She laid on top of the bed on top of the covers. She was wearing elastic shorts and started feeling something inside of her underwear. Defendant had slipped his hand beneath her shorts and under her underwear:

"His hand was inside my underwear underneath my shorts and his fingers were touching me and rubbing me inside the lips, the opening of my vagina. And when I noticed that he was doing that, I slapped his hand and told him to stop. And he took his hand out and we continued watching the show. And then he tried to do it two more times. He'd put his hand inside my underwear and he touched me near the lips of my vagina. He didn't touch me as far down, but he did touch me. And finally after the third time I just got up and I walked out and I had an urge to use the restroom. And when I urinated, it burned."

She confirmed with the State that defendant had rubbed up and down and inside the lips of her vagina. T.R. said that defendant was a construction worker and his hands felt rough and dirty.

¶ 18    T.R. next explained that, in 2001, her family moved back to Illinois from Texas. Afterwards, she and her siblings frequently spent time with Shelly and defendant in their home, and another incident occurred when she was 10 years old.  Defendant was in his bedroom while the other family members were eating breakfast.  He called for Shelly, but she was busy.  She asked T.R. to see what he wanted.  T.R. went to the bedroom, and defendant was in bed underneath the covers.  She asked what he wanted, and he did not answer, but beckoned for her to move closer. T.R. again asked defendant what he needed, and he asked whether she thought she could give him what he needed.   "And I said I don't know, what is it.  And he grabbed me and pulled me to him, and he lifted up my T-shirt and my training bra up to shoulder length on my left side and he put his mouth to my nipple and started sucking on it and tugging my nipple."  She pushed him away and ran out of the room.  T.R. did not want to tell Shelly, because she did not want Shelly to "get in trouble with him because I knew that *he would get violent with her and he would yell at her.*" (Emphasis added.)  However, Shelly saw T.R. crying and asked what was wrong.  T.R. told her what defendant did, and "she got really mad *and she believed me.*  And she went into the room and she was stomping and she was yelling and she asking him what did he do, why did he do it. And he was flat out denying it.  He said I didn't do anything."  (Emphasis added.)  T.R. accused defendant of lying but complied when Shelly sent her out of the room.  When Shelly returned, she told T.R. that defendant was just playing with her and had been trying to make her laugh by "blowing raspberries" and making "fart noises" on her stomach.  T.R. confirmed at trial that defendant did not blow on her stomach; he put her nipple in his mouth.

¶ 19    Finally, in the spring of 2003, defendant roughly grabbed T.R.'s face and kissed her on the mouth, shoving his tongue inside.  T.R. testified that this happened on 7 to 10 occasions; often enough to not be a random occurrence.

¶ 20   On April 5, 2003, T.R. was playing at home when Tanya called her and C.R. downstairs. Tanya and T.R.'s father said that grandma had called about something that happened to their Aunt D.E., and while they did not say what had happened to D.E., they asked T.R. if defendant had ever touched her inappropriately. T.R. said that he had, and she told Tanya about the incidents. T.R. did not describe to Tanya any vaginal penetration. She explained that she later told the police about it, however, and that she had demonstrated the penetration for them by using her fingers.

¶ 21   On cross-examination, defense counsel noted that T.R. had been crying on the stand. Later, counsel asked:

> "COUNSEL:   The incident that you described to us about the first incident happened in 1996, correct?
>
> T.R.:  No. It happened *in 1995*.
>
> COUNSEL:  1995. How old were you in 1995?
>
> T.R.:  I was four or five years old."  (Emphasis added.)

What subsequently followed was a confusing exchange about how old T.R. was in 1994 (age two) and whether she could speak then, which prompted a recess. When examination resumed, defense counsel said:

> "COUNSEL:  T.R., last time I talked to you I indicated 1996; would that be right?
>
> T.R.:  I would say it was *1997. I was five years old*.
>
> COUNSEL:  In 1997 you were five years old?
>
> T.R.:  Yes.
>
> COUNSEL:  You were not two years old?
>
> T.R.:  I was not two years old.
>
> COUNSEL:  So that was a mistake?

> T.R.: Yes.
>
> COUNSEL: And in 1997 you were five years old and in 2003 you were 11 years old?
>
> T.R.: I was." (Emphasis added.)

¶ 22    Defense counsel continued his cross-examination by asking T.R. about the written statement that she provided to police in 2003, when she was 11 years old. He presented it to her and confirmed that, in that statement, she did not write that defendant touched her vagina. She did not say that he touched her private parts. She apparently wrote only that defendant's hands went under her shorts and underwear. T.R. further agreed that, in her written statement, she did not express that defendant sucked her nipple; rather, she wrote that he lifted her shirt and kissed her chest.

¶ 23    On re-direct, the State asked,

> "STATE: I just want to clarify some things. At the time when you were at the defendant's apartment in Mundelein, he put his hand down your pants and into your vagina, how old were you?
>
> T.R.: I was five years old.
>
> STATE: Your date of birth is January 19, 1992?
>
> T.R.: Yes, that is my date of birth.
>
> STATE: How do you know you were five years old?
>
> T.R.: We had moved to Laredo[, Texas]; and when we moved to Laredo, I just started kindergarten.
>
> STATE: At the time where the defendant raised your shirt and put your nipple in his mouth, how old were you?

T.R.:  I was about 10 years old.”

¶ 24    In addition, the State asked T.R. if she recalled “describing” to police “how” defendant lifted her shirt and put his mouth on her chest and nipple.  Defense counsel objected to “improper direct testimony,” and the court overruled the objection.  The State asked T.R. if, prior to giving her written statement, she told police “how” defendant put his hands in her pants.  The State prompted, “In fact, you described to the detective with your hands, correct?”  T.R. answered, “Yes. He made me—He had me do a representation of a vagina with my fingers and he had me use my other hand to show how [defendant]’s fingers touched me.”  The State asked her to demonstrate how she used her fingers to show the officer.  T.R. responded, “He had me go like this. This is the vagina. These are the lips.”  The State summarized, “Your Honor, for the record, the witness is taking her pointer and middle finger and pointing them outward.”  T.R. then continued, “Then he had me take these two fingers and I showed him how it went inside in between the lips.”  The State summarized, “For the record, the witness took her right hand, her other hand with her two fingers and placed those two fingers between the two fingers on her left hand.”

¶ 25                                    b. Shelly

¶ 26    Shelly Ortega, defendant’s wife and T.R.’s aunt, testified that she remembered one time when T.R. was upset.  “I don’t remember the exact date.  But I was in the kitchen making pancakes for them, and [defendant] was in the back room yelling my name.  And I asked [T.R.] to go see what he was doing or what he wanted because he kept on screaming my name, and she never came back.”  T.R. was outside and did not want to come back inside because something had happened when she had gone to talk to defendant.  She further explained:

“I asked him to tell her to come in and talk to me and see what was wrong.  And she said when she had asked him what he wanted, she sat down on the bed and he lifted up

- 11 -

her shirt. And she jumped up and ran outside. *She said that she thought he was going to put his mouth on her breast.* And I immediately went into the back bedroom and told him what she had said to me and I wanted to know if it was true. He immediately jumped up and said I'm so sorry you thought that way. He's like no, no, that's not what's going on. I was going to give her a Zurbert on her belly. *But I turned to her and asked her did he put his mouth on your breast, and she said no. And I said then is it possible that that's what he was going to do. And she said yeah, there was a possibility.* So we left it at that and I just told him you know what, there will be no more. She's obviously growing up now. You can't rough-house with her, you can't play like you used to with her because now it's different." (Emphases added.)

¶ 27                                                  c. C.R.

¶ 28     C.R., age 23 at trial, testified that she is T.R.'s sister. Her birthday is July 13, 1995. In 2002 to 2003, she was in second grade. She would frequently visit Shelly and defendant at their home in Round Lake Beach and, in January 2003, when she was age seven, she and her sister stayed there because pipes burst in their own home. During that time, on multiple occasions (she later estimated 20 times), defendant made her uncomfortable by grabbing her face, kissing her on the lips, and forcing his tongue into her mouth. He would taste of alcohol and cigarettes. C.R. testified that this first happened when she was "[p]robably around six or seven when we first moved back to Illinois from Texas." She told Aunt Shelly, who said that defendant was just playing. In April 2003, at their own home, C.R.'s parents asked her if anything had ever happened, and she told them defendant would frequently kiss her and force his tongue into her mouth. It was then reported to police, who took her statement and asked questions.

¶ 29     On cross-examination, the following exchange ensued:

"COUNSEL:  Okay. When you said that he kissed you, *did he do anything else*?

C.R.:  There were times where he frequently touched my butt.

COUNSEL:  Touched your butt?

C.R.:  Yes, or spanked my butt, rather, not in a disciplinary way, more like he was having fun with it.

COUNSEL:  Having fun, as an uncle would tease a niece; is that the fun you're talking about?

\*\*\*

C.R.:  Are you asking that if like this is normal behavior for an uncle to display onto his niece?  This is not normal behavior.

COUNSEL:  You were seven years old at that time. You were not 23 years old at that time; would that be right?

C.R.:  Correct.

COUNSEL:  So you're saying to us that at seven years old the uncle cannot tease you?

C.R.:  That's not teasing.

COUNSEL:  The uncle cannot kiss you?

C.R.:  No, not in that way.

COUNSEL:  The uncle can't hold you?

C.R.:  What do you mean by hold?

COUNSEL:  Put a hug on you.

C.R.:  Hugging is fine, but as far as touching my butt, no.

COUNSEL:  You're saying when he touched your butt, was it a slap?

C.R.:  Yes, in most cases.

COUNSEL:  Was it a punch?

***

COUNSEL:  Sorry. Was it a pat?

C.R.:  It was a spank.

COUNSEL:  It was a what?

C.R.:  A spank, a slap.

COUNSEL:  A slap like this (indicating).

C.R.:  Yes.

COUNSEL:  On your butt?

C.R.:  Yes.”  (Emphasis added.)

¶ 30    Counsel later asked C.R. whether she had ever reached out to her uncle after 2003, and she said “no.”  He asked why not:

“C.R.:  After all this happened, my Aunt Shelly was ostracized from my family.  We didn’t want any connections with her or him.  And growing up he was referred to as him and I referred to him as the devil.

COUNSEL:  The devil?

C.R.:  Yes.

COUNSEL:  That’s how you treated him way back when?

C.R.:  Not way back when but from the time of the reporting of the incidents up until now.

COUNSEL:  The devil?

C.R.:  Yes.

COUNSEL:  He's a devil because he kissed you?

C.R.:  Because I feel he took away my innocence.

COUNSEL:  Taking away your innocence is by kissing you?

C.R.:  Yes."

¶ 31    On re-direct, the State followed up on defense counsel's line of questioning:

"STATE:  Did you call him the devil for any other reason other than just what he did to you?

C.R.:  I know that there were incidents with my sister and—

DEFENSE COUNSEL:  I'm going to object to that, Judge.

COURT:  Overruled. *You opened the door.*

C.R.:  I know that there were incidents that happened with my sister and my aunt as well.  I did not know the nature.  So because of that, growing up with that trauma and knowing that that had happened to me and my sister when we were young, I feel that he took away our innocence that no child should ever have taken away from them.  So yes, I did refer to him as the devil.

STATE:  That was because of what he did and what you found out what he did, correct?

C.R.:  Correct."  (Emphasis added.)

¶ 32                                    d. Tanya

¶ 33    Tanya R. testified that she is T.R.'s and C.R.'s mother.  On April 5, 2003, she had a conversation with her daughters.  The State asked her why she had that conversation, and she replied that she had received a phone call from her mother.  Defense counsel objected to "any type of conversation concerning a phone call."  The court allowed the witness to answer, explaining it

did not yet know what she was going to say. Tanya answered, "I received a phone call from my mother that [defendant] had tried to rape my sister, my sister [D.E.]" The court then ruled, "Okay. It's received for a limited purpose. It's overruled. It's not for the truth of the matter asserted. Go ahead, State." Tanya explained that D.E. was around 22 or 23 years old at the time. After the call, Tanya and her husband asked their daughters whether, since he was with them frequently, defendant had ever tried to do anything inappropriate to them. Tanya testified that T.R. lowered her head, slowly raised her hand, and she said quietly said "yes." It was not T.R.'s normal demeanor to be quiet. T.R. told Tanya that defendant had raised up her shirt and kissed her at the bra line and that he had tried to kiss her on the lips several times. T.R. explained that defendant had been in the bedroom, Shelly was in the kitchen, and, when defendant called for Shelly, Shelly asked T.R. to see what defendant wanted. When T.R. went into the room, she asked him what he wanted. Defendant said, "can you help me with what I want your aunt to do," lifted her shirt, and kissed her at the bra line. T.R. did not say that he sucked her nipple or breasts. T.R. also explained that defendant would kiss her on the lips and that, on one occasion when she was younger and watching television, he had put his hands down her pants. T.R. said that she had not previously told her parents about these incidents because she did not want her Aunt Shelly to get into trouble. Tanya next asked C.R., who was present when T.R. was talking, whether defendant did anything to her. C.R. stated that defendant also kissed her on the lips.

¶ 34    Tanya explained that her family moved between Illinois and Texas multiple times, including a move to Texas from 1997 through 2001. On cross-examination, defense counsel sought to verify when T.R. had said the early incident happened, and, in doing so, commented to Tanya that it was not in 1998, or 1997, "it was 1996, right?" Tanya responded, "okay." Defense counsel then asked, what did T.R., in 2003, say about what happened in 1996, and Tanya answered

that T.R. said defendant put his hands in her pants while in the bedroom. She did not provide other details to Tanya, and Tanya did not ask. Instead, she reported the incidents to the police.

¶ 35                                  e. Officer Gilbert Rivera

¶ 36    Gilbert Rivera, Chief of Police for the Round Lake Beach police department, testified that, on April 7, 2003, he was assigned to investigate the allegations against defendant. Although not the lead investigator on the case, Rivera conducted defendant's interview because defendant communicated that he would prefer that the interview be conducted in Spanish and Spanish is Rivera's first language. In the interview, defendant denied touching T.R., but said that once, in the bedroom, he lifted her shirt to blow on her stomach and she might have misinterpreted his actions. Defendant tried to physically demonstrate on Rivera's stomach what he had done to T.R.; Rivera stopped him. According to defendant, T.R. became upset and Shelly said he could not play with her like that anymore because she was getting older. Defendant agreed that he would cup T.R.'s chin and kiss her on the mouth. He did not recall putting his tongue in her mouth, but he agreed that she did not like the kissing. Defendant said that he used cocaine and alcohol and that, before the incident where he lifted her shirt, he might have used cocaine. Rivera revisited that instance:

> "[I] asked him specifically if he had kissed her. At point he stated that he actually did kiss her and that he actually kissed her on the breast. I then informed him that he had previously told me that he had just blown on her belly. But then he reiterated and said he actually kissed her on the breast. I then asked him which breast it was. Again since we were sitting so close to each other, he said he was not sure, but he believed it to be the right breast and then he reached out and actually touched me on my right chest.
>
> ***

I asked him if it was a situation where he kissed her over the clothing or under the clothing. He stated that he had lifted up her shirt and kissed her on the bare breast. I asked him if he lifted up her training bra to do this. He stated that he could not recall if she had a training bra. He just remembered lifting her shirt and kissing her on the bare breast. I asked if he had sucked on her breast. He stated he did not linger, that he kissed, made a kissing sound. And so he did not linger on the breast."

¶ 37 Rivera revisited the kissing incidents, and defendant said he put his tongue in the girls' mouths, but not all the way in. Rivera asked defendant what he would do if he had a daughter and someone had done to his daughter what he had done to T.R. According to Rivera, defendant quickly replied, "I'd kill him." Rivera asked whether defendant would prepare a written statement, and he agreed to do so. Defendant's statement was written in Spanish, but Rivera translated it into English as saying:

"I am very sorry for everything that happened. I believe that I do not deserve you to forgive me, [T.R.] I know that you are not to blame. I am to blame for not thinking with my head. I always had some beer and cocaine. In Mundelein what I remember is I was giving you and Julian a bath. But if I did you wrong, forgive me. If you have a little piece of heart to forgive me for everything that I made you suffer and forgiving me for touching your private parts, and you also [D.E.], forgive me. I believe I need professional help. Hopefully, you will help me, please."

¶ 38                                              2. Defendant's Case

¶ 39 The court denied defendant's motion for a directed verdict. Thereafter, defendant testified (in English) that he cared for the children when they stayed with him. Sometimes, when they were young, he would bathe them, but Shelly was always present. He loved them like they were his

own daughters and showed them love with hugs, kisses, conversation, and emotional support. Defendant agreed that he would kiss them on their mouths, but he testified that he did not do so for sexual gratification, he never put his tongue in their mouths, and that they did not tell him that they did not like when he held their cheeks to make them pucker. He said he did not touch T.R. in her underwear, vagina, or her breast. He touched her bottom with spanks and would tickle the children, horseplay with them, bathe them, and play games. However, he never sexually touched them.

¶ 40    Defendant agreed that, in 2003, he was supposed to come to court, but instead left the jurisdiction for 13 years. Defendant explained that he left Illinois because he felt he was being taken advantage of, could not defend himself, and that the accusations commenced because he asked D.E. to pay him rent and she refused. While defendant was in Wisconsin, he adopted a new name and identity. He denied telling Officer Rivera that he kissed T.R.'s breast and said Rivera had pressured him to "pick a side" of her chest. Defendant noted that his statement asked for forgiveness only if he touched them improperly in the bath and that it did not mention any of the alleged incidents.

¶ 41                     3. Closing Arguments and Jury Instructions

¶ 42    In its closing argument, the State referenced what had happened to T.R. when she was "five years old," and that, although she was told to go to defendant in the bedroom, she did not want to go because "she didn't want to get that whip." Further, in rebuttal, the State noted:

"Now, sexual gratification in the touching of the vagina and a predatory kind of go hand-in-hand because one incident—or one thing that [T.R.] talked about in the room. She was five-years old. I do not know where 1995 comes from because my math when she was born in '92 she's five-years old in 1997, but she talked about that incident. And she was

clear because they had moved to Laredo, she had just finished kindergarten and come back from summer break to visit so it is clear she was five-years old."

¶ 43    After closing arguments, the court instructed the jury.  It stated that the indictment was not evidence and was merely the formal method of charging defendant, but it also again read that "the indictment states that the offenses charged were committed between January 1, 1996, and March 31, 2003."  Further, over defense counsel's objection, the jury was instructed, "if you find the offense charged was committed, the State is not required to prove that it was committed on the particular date charged."  Finally, over defense counsel's objection that there were "no offenses at the time," the court instructed the jury that it could consider bad acts other than the offenses charged.

¶ 44    Defense counsel had also objected to the instruction pertaining to the "main statements" that had been admitted under section 115-10 of the Code.  The objection was overruled, and the jury was told it could consider whether T.R. made statements concerning the offenses in this case and what weight to give them.  As to other crimes, the jury was instructed:

> "Evidence has [been] received that the Defendant has been involved in offenses other than those charged in the indictment.
>
> This evidence has been received on the issue of the Defendant's propensity and may be considered by you only for that limited purpose.
>
> It is for you to determine whether the Defendant was involved in those offenses; and, if so, what weight should be given to this testimony on the issue of propensity."

¶ 45    Before the jury retired to deliberate, defense counsel asked that, as part of the exhibits being sent back to the jury, an inconsistent statement be included. It appears likely that counsel was referring to T.R.'s 2003 written statement to police, as counsel referenced section 115-10.1 of the

Code (725 ILCS 5/115-10.1 (West 2018)) and that the inconsistent statement was within the victim's knowledge, and she had been subjected to cross-examination about it. The court declined to allow the requested inconsistent statement to go back to the jury. During its deliberations, however, the jury specifically asked to see T.R.'s written statement that she gave to police in 2003. Over defense counsel's arguments that, "I told you that it was a prior inconsistent statement" under section 115-10.1, and "I want the jury to see that statement," the court denied the jury's request to see the statement, explaining to defense counsel that the written statement had not been admitted into evidence and that T.R. had admitted the impeachment points that counsel had exposed during cross-examination. Defense counsel responded that the statement was "key," the decision was discretionary, and that he could not believe that the court would not allow the jury to see the statement.

¶ 46    The jury convicted defendant of one count of predatory criminal sexual assault of a child and three counts of aggravated criminal sexual abuse.

¶ 47                    D. Posttrial Motion, *Krankel* Hearing, and Sentencing

¶ 48    Defendant moved for a new trial, in part on the basis that he was charged with a crime from 1996 through 2003, when the crime did not exist during part of 1996. In addition, it appears he argued that the court erred by admitting "cumulative prior inconsistent statements of witnesses," admitting other-crimes evidence, and by failing to send copies of all prior inconsistent statements, including the written statement that the jury requested, back to the jury during deliberations. Further, prior to sentencing, defense counsel again noted that defendant was charged with a criminal offense that occurred in 1996, but the predatory criminal sexual assault offense was, during that time, held to be unconstitutional.

¶ 49    In response, the State acknowledged that the predatory offense did not become effective until May 29, 1996, but argued that, since T.R. testified that the incident occurred when she was five years old, it should be granted leave to amend the indictment to change the beginning of the date range alleged therein to January 19, 1997, the date upon which T.R. turned age five.

¶ 50    The court did not expressly address the State's posttrial motion to amend the indictment, but it denied defendant's motion for new trial, stating as follows:

" *** I recall well all of the events that occurred up to and including the trial. I recall while the arguments that defense made concerning their difficulties or their concerns over the way the case was charged and the amendments that were made, I commented at the time that they were appropriate in my view, that they—the State has wide latitude and the case law is replete with examples of amendments being made to indictments to set dates in conformity with the evidence as the State learns of it.

It's also true that when dealing with victims of tender years that the case law and the Courts dealing with those situations have recognized that there are certain limitations to children and to the way they testify, but what is true here as in each of the cases that I've reviewed is that a fact finder was able to hear and evaluate the testimony, that both sides were given full and fair opportunity to advance through—through examination and cross-examination whatever theories they have.

I recall my rulings to objections, and I certainly believe that there is no basis for me to reconsider any of those decisions. I think that they were firmly rooted in the law and the facts as I had them in this case. I will say that even though you have difficulties with some of the state of the law in this case, there is nothing in any of your arguments or anything that you brought to my attention that indicates that there was ever anything that

was done inappropriately or even suggested to be inappropriate that would merit my attention. So the bottom line in all of this is your motion is and shall be respectfully denied."

¶ 51 Counsel informed the court that defendant had filed a *pro se* motion for a new trial, alleging ineffective assistance of trial counsel. The written motion alleged that the State had previously offered him a sentence of six years' imprisonment with day-for-day credit and that, at the time of the offer, he had already served two years. Defendant alleged that he had wanted to take the offer, but his counsel said he had to go to trial, otherwise he would withdraw. Defendant asserted that he felt helpless and, because of counsel's threat of withdrawal, that he had no choice but to go to trial. (The motion was written by someone else in the jail).

¶ 52 In court, with the assistance of a Spanish translator, defendant explained that the State had offered him six years in the Department of Corrections at 50% and that he wanted to take the offer, but counsel said he was not going to take the offer because he wanted defendant to receive only time served. "He took me to trial without letting me know," and, "that's what I said when we got here and he said not to worry." Defendant asserted to the court that his counsel told him that his case was going to be dismissed and, if they lost the motion, he would receive the minimum sentence.

¶ 53 The court questioned defendant's counsel:

> THE COURT: Okay. All right. [Counsel].
>
> COUNSEL: Yes, Judge.
>
> THE COURT: Did you engage in negotiation for [defendant] with the State?
>
> COUNSEL: Yes. They offered me an offer I think at the time of trial or just prior to the trial, your Honor.

THE COURT: And what was the offer?

COUNSEL: I have it in writing. I think it was seven years.

THE COURT: So it was a formal offer that the State wrote up and made to you?

COUNSEL: Yes, Judge. I have it in the papers.

\*\*\*

THE COURT: Okay. And whatever offer it was, you believe it was on a Class 2 felony?

COUNSEL: Yes, sir. I have it here.

THE COURT: And did you convey that to [defendant]?

COUNSEL: Yes, Judge.

THE COURT: And what did [defendant] decide to do?

COUNSEL: It was probably –

DEFENDANT: He didn't say that to me.

THE COURT: [Defendant], I listened to you. I'm now talking to [your counsel]. I'll talk to you again.

COUNSEL: It was joint to proceed to trial."

¶ 54    Defendant also showed the court a letter, reflecting that his counsel was trying to get the case dismissed and, if he did not succeed on that motion, to get a minimum sentence. The court stated, "According to the letter you gave me, [defendant], he didn't promise you anything. He told you he was trying his best to get a good result for you. And based on what I've seen so far, that's what he's been trying to do every step of the way." Counsel showed the court the January 25, 2018, written offer from the State, and the court asked counsel if that was rejected by defendant, and counsel answered, "yes."

¶ 55    The court rejected defendant's ineffective-assistance claim.    Noting that defendant participated throughout the proceedings, it found:

> "The allegations that he advanced or attempted to advance with regard to *Krankel* I find are also not well placed.  He's indicated that someone who is known to me to be a person that was in our jail wrote these motions for him suggesting that he was told things by his attorney which simply are not borne out by the facts.  Just the contrary, the defense attorney indicates that he[,] as he is supposed to do[,] engaged in negotiations on [defendant's] behalf, obtained an offer significantly under the minimum that [defendant] could receive if convicted of the top charge in this case, that that was conveyed to [defendant], [and was] rejected by [defendant].
>
> [Defendant] then participated in his trial including testifying in front of this jury in English, and there is nothing that I find in the record or in any of the motions that sways me in any way to think that there is a need for any further inquiry whatsoever into this claim that [counsel] promised him alternatively that his case would be dismissed or that he wanted to take a 50 percent offer on a minimum sentence to a lesser charge.  Nothing at all.  The motion's denied."

¶ 56    The court then sentenced defendant to 13 years' imprisonment for the predatory-criminal-sexual-assault-of-a-child conviction to be served consecutively to concurrent terms of 6 years' imprisonment for each of the aggravated-criminal-sexual-abuse convictions.  The court explained that, upon completion of the sentence, defendant would be subject to three years of MSR.  The written judgment lists the MSR period, however, as three years to life.  It also lists the date of the offenses as January 1, 1996, to March 31, 2003.

¶ 57    Defendant moved to reconsider the sentence. On August 7, 2019, the court granted the motion in part, as it related to truth-in-sentencing for the predatory-sexual-assault conviction. This appeal followed.

¶ 58                                    II. ANALYSIS

¶ 59                          A. Predatory Criminal Sexual Assault

¶ 60    There is no dispute on appeal that the statute creating the offense of predatory criminal sexual assault did not become effective until May 29, 1996. As such, from January 1, 1996, through May 28, 1996, a period included in the charging indictment here, there was no such offense. Accordingly, defendant argues that, because he was charged with committing an offense during a date range that encompassed a period before the offense was created, the indictment did not state an offense and his conviction for predatory criminal sexual assault must be reversed.

¶ 61    The State asserts that defendant's position is incorrect because (1) prior to trial, it orally amended the indictment to a time frame when the statute was in effect (*i.e.*, July 1, 1996), which sufficiently apprised defendant of the nature of the charges against him; and (2) the trial evidence reflects that defendant committed the offense at a time when the statute was in effect (*i.e.*, in 1997, when T.R. was five years old), and "no evidence suggested that defendant committed the offense during the time where the [   ] statute was not in effect." Alternatively, the State requests that this court impose upon defendant a conviction for the lesser-included offense of aggravated criminal sexual abuse and that we remand the cause for resentencing or, if we disagree, hold that defendant does not have a claim of double jeopardy, given the overwhelming evidence of his guilt.

¶ 62    We review *de novo* the sufficiency of a charging document. *People v. Espinoza*, 2015 IL 118218, ¶ 15. For the following reasons, we agree with defendant that the indictment on count I was fatally defective, and we vacate defendant's predatory-sexual-assault-of-a-child conviction.

¶ 63    The offense of predatory criminal sexual assault of a child was created by Public Act 89-428, with an effective date of December 13, 1995; however, it was later declared unconstitutional. See *Johnson v. Edgar*, 176 Ill. 2d 499 (1997). The effect was to render the offense void *ab initio*, "as if it never existed." *People v. Tellez-Valencia*, 188 Ill. 2d 523, 526 (1999). The General Assembly, in Public Act 89-462, later reenacted the offense, but with an effective date of May 29, 1996. "[T]his reenactment had the effect of creating an entirely new criminal statute." *Id.* Here, the indictment alleged that defendant committed the offense of predatory criminal sexual assault of a child between January 1, 1996, and March 31, 2003. As such, it included a period, albeit a short one, when the offense did not exist, *i.e.*, from January 1, through May 28, 1996.

¶ 64    Our standard of review is outcome determinative here. Specifically, when, unlike here, an indictment is challenged *for the first time* on appeal, the standard of review is somewhat liberal, allowing the court to consider whether the defect in the indictment prejudiced the defendant in preparing his or her defense. *People v. DiLorenzo*, 169 Ill. 2d 318, 322 (1996). "In such a case, it is sufficient that the indictment apprised the accused of the precise offense charged with enough specificity to (1) allow preparation of his [or her] defense and (2) allow pleading a resulting conviction as a bar to future prosecutions arising out of the same conduct." *Id*. (citing *People v. Thingvold*, 145 Ill. 2d 441, 448 (1991)). However, when, as here, the sufficiency of the charging instrument is attacked pretrial, the standard of review is to determine only whether the instrument "*strictly* complies with the requirements of section 111-3[(a)] of the Code of Criminal Procedure of 1963 [725 ILCS 5/111-3(a) (West 2018)]."[2] (Emphasis in original.) *DiLorenzo*, 169 Ill. 2d at 321-22.

---

[2] Section 111-3(a) of the Code provides:

¶ 65 Here, on the morning of trial, the State orally moved to amend the indictment to allege that defendant committed the predatory act in 1996. Defense counsel immediately objected that there was no such crime in 1996 (which was partly true, as the crime did not exist until May 29 of that year). The State agrees, and it also concedes on appeal that, for purposes of our review, defendant challenged the sufficiency of the indictment pretrial. Indeed, in addition to challenging the sufficiency of the indictment in response to the State's motion to amend, at one point during the instructions conference, counsel reiterated that there were "no offenses at the time." Further, defendant's primary argument in his motion for a new trial concerned the indictment's failure to state an offense for predatory criminal sexual assault because the statute creating the offense was not in effect during the period charged. In response to the motion for new trial, the State conceded the point, but requested leave to again amend the indictment, which the court never addressed, and, therefore, never granted. As such, there is no dispute that defendant is not challenging the indictment for the first time on appeal, and we do *not*, therefore, perform a prejudice analysis. Rather, we consider whether the indictment "strictly" complied with statutory charging requirements. *DiLorenzo*, 169 Ill. 2d at 321-22

---

"(a) A charge shall be in writing and allege the commission of *an offense* by:

 (1) Stating the name of the offense;

 (2) Citing the statutory provision alleged to have been violated;

 (3) Setting forth the nature and elements of the offense charged;

 (4) Stating the date and county of the offense as definitely as can be done; and

 (5) Stating the name of the accused, if known, and if not known, designate the accused by any name or description by which he can be identified with reasonable certainty." (Emphasis added.) 725 ILCS 5/111-3 (West 2014).

¶ 66    There exists strong support for defendant's argument that, because it encompassed a period before the statute creating the offense was in effect, count I of the indictment did not strictly comply with the requirement that it plead an offense. We start with *Tellez-Valencia*, where, after being charged by indictment with predatory criminal sexual assault of a child, the defendants were convicted; however, while their appeals were pending, the law that created the offense was invalidated. *Tellez-Valencia*, 188 Ill. 2d at 525. The effect was to render the offense void, as if it never existed. *Id.* at 526. As such, the supreme court held that each of the "defendant's charging instrument[s] thus *failed to state an offense* because the statute under which each was charged and prosecuted *was not in effect* when the alleged offenses occurred." (Emphasis added.) *Id.* Further, noting favorably the appellate court's decision in *People v. Wasson*, 175 Ill. App. 3d 851 (1988), the supreme court held that the State could not amend the charging instruments on appeal to instead allege aggravated criminal sexual assault: "the defect caused by charging an offense based upon a statute not in effect when the alleged offense occurred is fatal, rendering the entire instrument invalid, and warranting reversal of [the] defendants' convictions." *Id.* at 527-28.

¶ 67    In *Wasson*, the court considered an information that charged the defendant with one count of aggravated criminal sexual assault, an offense that was not effective until July 1, 1984; nevertheless, the information charged that the defendant committed the act between July 1, 1983, and April 24, 1985. See *Wasson*, 175 Ill. App. 3d at 853. The jury was presented with evidence that the defendant committed acts on numerous occasions over the alleged period, but no jury instruction was given (indeed, the trial court refused to give one) that an essential element of the offense was finding that it occurred on or after the statute's effective date. On appeal, the court held that, to the extent it charged an offense prior to July 1, 1984, the information was fatally defective and that the flaws invalidated the entire instrument and warranted reversal of the

defendant's conviction. *Id.* at 855. The defendant in *Wasson* challenged the information for the first time on appeal, and the court found him prejudiced:

> "While the information adequately apprised defendant of the nature, cause, and elements of the charge against him, it also charged him for *conduct which occurred before the statute came into effect*. Defendant was hindered in the preparation of his defense because he was *forced to answer to crimes for which he could not have been lawfully convicted*." (Emphases added.) *Id*. at 855.

Further, even though the appellate court was "convinced" that the victim's testimony established that an act occurred *after* July 1, 1984, it noted that there was conflicting testimony as to when the offense was committed and, therefore, it was impossible to know whether the jury's verdict was based on an act that predated the effective date of the charged offense. *Id*. at 859-60. The court reversed the conviction and remanded for a new trial. *Id.* at 860.

¶ 68    In *People v. Mescall*, 379 Ill. App. 3d 670 (2008), this court considered, in the framework of a section 2-1401 petition (735 ILCS 5/2-1401 (West 2006)), whether an information charging predatory criminal sexual assault of a child, based on conduct that allegedly occurred over a period that included time before the effective date of the statute, was void or voidable. *Id.* at 672. In that analysis, we held that the trial court had jurisdiction to enter the order and that the order was merely voidable, but we also noted "the information was defective because *a portion of the conduct complained of* was alleged to have occurred *before* the effective date of the statute." (Emphases added.) *Id.* at 678. Further, in rejecting the defendant's arguments (again, presented not on direct appeal, but via a section 2-1401 petition), the court noted that the defendant's attorney had *acquiesced* to a jury instruction stating that, if it found the offenses charged were committed, the State was not required to prove that they were committed on the date charged. *Id.*

¶ 69    In addition to the foregoing authority supporting defendant's position, we note that, recently, another panel of this court considered an indictment that charged the defendant with predatory criminal sexual assault of a child "on or between March 27, 1995[,] and March 27, 1997, inclusive." *People v. Libricz*, 2021 IL App (2d) 190329-U, ¶¶ 6-7.  The court determined that the two relevant counts of the indictment were, indeed, defective, as the defendant was charged with an offense that did not exist during a portion of the alleged period. *Id.* at ¶ 40.  It further explained,

> "[a]lthough the present case is distinguishable from *Tellez-Valencia* because the offense here did exist during a portion of the alleged periods, we nevertheless note that *Tellez-Valencia* cited *Wasson* with approval.  Further, in *Mescall*, the same kind of charging irregularity as we have in this case was found to have rendered the charging instrument in that case defective[.]" *Id.*

Critically, although the court ultimately affirmed the defendant's conviction, despite the defective charging instrument, it did so only after noting that the defendant had *not* challenged the indictment pretrial but was instead challenging the indictment *for the first time on appeal*, thus, allowing for a prejudice analysis. *Id.* ¶¶ 42, 48.  In addition, we also note that the court emphasized that the defendant was convicted in a bench trial, where the trial judge was presumed to know the law and, as such, would not have entered the conviction unless it found that the offense occurred on a date after which the statute had taken effect. *Id.* ¶ 47.[3]

---

[3] Although not cited for persuasive or precedential purposes, we note that, in *People v. Sanchez*, 2020 IL App (2d) 181046-U, ¶ 16, another panel of this court held that the trial court had properly granted the defendant's motion to dismiss an indictment that was fatally defective for alleging conduct within a date range in which the conduct was not yet prohibited by statute.  Noting

¶ 70    Here, there is simply no escaping the fact that count I of the indictment was defective. Although it originally charged defendant with committing the offense between January 1, 1998, and March 31, 2003, the State amended the indictment, over defendant's objection, to a period commencing January 1, 1996. As such, the indictment, as it existed at trial and as repeatedly read to the jury, alleged that defendant committed predatory criminal sexual assault of a child during a date range that included time before the effective date of the statute creating the offense. Curiously, the State suggests that, because its oral request to amend the indictment requested a change to July 1, 1996, *i.e.*, after the effective date of the statute, the charging instrument properly alleged the offense and defendant was, therefore, sufficiently informed of the nature of the charges against him. We disagree. The court gave the State leave to make a change that it did not, in fact, make. The indictment was *not* changed to July 1, 1996. It was changed to January 1, 1996.

---

the requirements of section 111-3(a) of the Code, including that the charging instrument state an offense, the court explained, "The degree to which a court should tolerate deviance from those requirements depends on the stage of proceedings in which the defendant first challenges the charge." *Id*. ¶ 14. As the defendant in that case attacked the charges before the trial court, and *not* for the first time on appeal, the court explained that the question was whether the charges *strictly* complied with pleading requirements. *Id*. Accordingly, the court held that the charges were properly dismissed, because they alleged that the defendant committed acts during a period when such conduct was not prohibited by the statute. *Id*. ¶ 16. Because "the sufficiency of the indictment is reviewed differently depending on when the defendant first challenges it," the court rejected the State's reliance on *Mescall*, where the defendant did not challenge the indictment until after he was convicted, and it affirmed the court's dismissal of the charges. *Id.*

Regardless of the State's *intentions*, and as it concedes on appeal, the indictment was twice read to the jury with the January 1, 1996, date. It concedes that it bore the burden of preparing the document to reflect the court's grant of its motion and that "the People had asked the court to amend the indictment 'on its face' which was incorrectly done." Moreover, and as the State also concedes, the indictment was never again amended.

¶ 71 The State next argues that, regardless of the date range alleged in the indictment, reversal is not warranted because defendant was not prejudiced. Specifically, it contends that the trial evidence reflected that defendant committed the offense of predatory criminal sexual assault of a child *after* the amended statute was in effect, as T.R. testified that it occurred when she was five years old, which would be on or after January 19, 1997. Further, the State asserts that, because defendant focused his defense on the victims having misinterpreted his actions, as opposed to the dates of the alleged incidents, he was not prejudiced. We reject these arguments.

¶ 72 First, while at risk of "beating a dead horse," we reiterate that defendant is not raising his objection to the charges for the first time on appeal, and we, therefore, strictly construe the indictment itself, not the evidence later introduced at trial. Although the State professes confusion on the appropriate standard of review for an unsuccessful pretrial challenge to the sufficiency of the indictment, asking us to conclude that, in this situation, a defendant is required to show prejudice that impacted his ability to prepare a defense, the foregoing authority clearly holds to the contrary. Indeed, the State cites no case where the defendant attacked the charging instrument prior to trial and the appellate court performed a prejudice analysis to assess whether the defect warranted reversal. One case the State cites, *Thingvold*, even contradicts its argument, as the supreme court there reiterated that, only when a defendant challenges an indictment for the first time on appeal should the court consider prejudice, whereas, when the defendant challenges the

charging instrument prior to trial, the analysis is whether the instrument strictly complied with pleading requirements. *Thingvold*, 145 Ill. 2d at 448. Indeed, the supreme court even stated that the appellate court had erred in considering that the jury in that case had been instructed to find one act by the defendant within the limitations period at issue, as such evaluations were "irrelevant" when there existed a pretrial motion to dismiss. *Id.* at 449-50. The supreme court authority reflects that, in our present situation, a showing of prejudice is not required; as defendant puts it, "[o]therwise, there would be no practical difference in the standard of review regardless of whether the charging document was challenged before or after trial."

¶ 73    Second, although we need not address it, we would also reject the State's assertion that the evidence made clear that the relevant act was committed in 1997. Without question, there was certainly some evidence to support the State's position; T.R. testified that defendant touched her vagina when she was five years old, which would have been in 1997. But we disagree that the record as a whole was as clear as the State would have us believe. Indeed, in full, the jury was first informed that defendant was charged with committing the crime between January 1, 1996, and March 31, 2003. Next, in opening statements, the State showed the jury a childhood photo of T.R., saying "[m]eet five-year-old [T.R.] This is back in *1996*. [T.R.] was *five years old*." (Emphasis added.) Defense counsel in opening noted that the State had referenced T.R. as being five years old *in 1996*. On direct examination, the State directed T.R.'s attention to 1996 and 1997, when she was "between four and six years old." On cross-examination, defense counsel asked about the vagina incident and whether T.R. had said it happened in 1996; she then responded, it happened in *1995*, when she was four or five years old. After some ensuing confusion and additional questioning, T.R. clarified that the event happened in 1997. During Tanya's cross-examination, defense counsel asked her when T.R. said that defendant touched her beneath her

shorts, "it was 1996, right?" and Tanya responded, "okay." In closing arguments, the State

clarified that T.R. was five years old in 1997, not 1995, but the court read the indictment again that

charged defendant with committing the offense between January 1, 1996, and March 31, 2003.

Given the myriad of dates presented at trial, and that, unlike in *Libricz*, defendant did not have a

bench trial, where we might generally presume that the judge knew the law and would not enter

judgment unless the evidence reflected the offense occurred on a date after the statute was

effective, here, we cannot know that the jury did not convict defendant for having committed the

act on a date between January and May 1996, before the offense charged existed. See *Wasson*,

175 Ill. App. 3d at 859-60. Further, we would note that, unlike in *Mescall*, counsel here *objected*

to the jury instruction that the State need not prove the date on which the charged crime was

committed. Thus, even if proper for our consideration, we would reject the State's argument that

reversal of the conviction is not warranted because the evidence at trial established the act occurred

after the statute was in effect.

¶ 74    Finally, we also note that we do not find at all convincing the State's argument that

defendant was not prejudiced by the indictment because his defense at trial did not focus on the

dates of the incidents. Again, what happened at trial is not relevant, because defendant objected

to the indictment prior to trial. Moreover, defendant *did* object to both the indictment dates and to

the instruction that the State need not prove the dates of the incidents. Those objections were

overruled. It was not defendant's job at trial to prove the State's case.

¶ 75    The State alternatively asks that, if we vacate the predatory-sexual-assault conviction, we

enter judgment instead for the lesser-included offense of aggravated criminal sexual abuse and

remand for resentencing. It contends that it is not seeking to amend the indictment on appeal, but

requests that we enter the conviction on the lesser-included offense pursuant to our powers under

Illinois Supreme Court Rule 615(b)(3) (eff. Jan. 1, 1967). We decline to do so. First, despite the State's claim that it is not trying to amend the indictment on appeal, the effect is the same. In *Tellez-Valencia*, our supreme court was faced with a similar request, and it held that allowing the State to instead allege a different crime with the same elements, after a defendant has been convicted on an invalid indictment, does not fall into the category of correcting merely formal defects and would, instead, constitute an improper amendment of the indictment on appeal. See *Tellez-Valencia*, 188 Ill. 2d at 526-27; see also *People v. Hindson*, 319 Ill. App. 3d 1, 7 (2001) (recognizing the difference between amending an indictment before trial and doing so after a defendant has been tried and convicted). Second, defendant here was alleged to have touched T.R.'s vagina on one occasion, and the jury convicted him of both predatory criminal sexual assault *and* aggravated criminal sexual abuse for that one event. As such, the propriety of our entering a *second* conviction for aggravated criminal sexual abuse based on the same, single alleged act is unclear.

¶ 76    In sum, "[a] charging instrument fails to state an offense if the statute under which the defendant is charged and prosecuted is not in effect on the date of the alleged offense. A conviction on a defective instrument must be reversed." *Wasson*, 175 Ill. App. 3d at 854. Defendant here argued that the State could not amend the indictment to 1996, as the predatory sexual assault crime did not exist, and the court overruled the objection. Defendant again noted that no offense existed during trial, and his objection formed the primary basis for his motion for new trial. The State conceded the point in its response to the motion for new trial, as it does on appeal. Defendant was convicted of a crime for a period that partly included time when there was no such offense. We reject the State's attempts to introduce a prejudice analysis or to obtain another conviction on the

lesser-included offense. We reverse and vacate defendant's predatory-sexual-assault-of-a-child conviction.

¶ 77                    B. Ineffective Assistance of Trial Counsel

¶ 78    Defendant next argues that he received ineffective assistance from his trial counsel. He raises six overarching challenges to counsel's performance concerning the: (1) failure to object to T.R.'s hearsay statements to Shelly; (2) incorrect objection raised with respect to T.R.'s hearsay statement to police officers and, then, counsel's failure to preserve an objection by raising the issue in the posttrial motion; (3) failure to object, on numerous possible grounds, to the double hearsay contained in Tanya's statement that she received a call from her mother that defendant had tried to rape D.E., and, then, his failure to preserve the issue by including it in the posttrial motion; (4) failure to object to introduction of defendant's alleged prior acts of violence, including his yelling at Shelly, getting violent with her, and use of a whip; (5) elicitation of, during C.R.'s cross-examination, certain prejudicial information, including that defendant hit her butt and that she referred to him as "the devil," as well as the extended exchanges with respect to those incidents; and (6) cumulative prejudice defendant suffered on account of counsel's errors.

¶ 79    The State disagrees that counsel's performance was ineffective. In sum, it contends that counsel engaged in a reasonable trial strategy that defendant did not commit the acts of which T.R. complained and, even if such acts occurred, T.R. misinterpreted the actions. Moreover, the State disagrees that defendant can establish prejudice by any of counsel's alleged failures.

¶ 80    The sixth amendment guarantees an accused in a criminal prosecution the right to effective assistance of counsel. See U.S. Const., amend. VI; *People v. Watson*, 2012 IL App (2d) 091328, ¶ 22. "The constitutional guarantee of effective counsel contemplates that, to render the trial a reliable adversarial process, counsel will engage evidentiary rules to shield his or her client from

a decision based on unreliable evidence" and, further, that the assistance will " 'provide an adversarial check to a prosecutor's excessive endeavors.' " *Id.* (quoting *People v. Fletcher*, 335 Ill. App. 3d 447, 453 (2002)). Although an attorney's decisions are presumed to be a matter of trial strategy, that presumption may be overcome where no reasonably effective defense attorney would engage in similar conduct. *Id.* ¶ 24. To establish a claim of ineffective assistance of counsel, a criminal defendant must establish deficiency and prejudice, namely (1) that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair (performance prong); and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different (prejudice prong). See *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *People v. Bull*, 185 Ill. 2d 179, 203 (1998). If the ineffective-assistance claim can be disposed of on the ground that the defendant did not suffer prejudice, we need not determine whether counsel's performance was deficient. *Id.* Further, "[a] defendant is entitled to reasonable, not perfect, representation, and mistakes in strategy or in judgment do not, of themselves, render the representation incompetent. [Citation] Counsel's strategic choices are virtually unchallengeable." *People v. Fuller*, 205 Ill. 2d 308, 331 (2002).

¶ 81 A defendant may raise an ineffective-assistance claim on direct appeal when the basis of the claim can be ascertained from the record. Here, defendant's claims concern counsel's on-the-record performance, and we can, therefore, ascertain whether counsel's performance fell below an objective standard of reasonableness and caused defendant prejudice. We review defendant's ineffective-assistance claim with deference to the trial court's findings of fact (unless contrary to the manifest weight of the evidence), but assess *de novo* the ultimate legal issue of whether

counsel's act or omission constituted ineffective assistance. *Watson*, 2012 IL App (2d) 091328, ¶ 24.

¶ 82                                    1. T.R.'s Statements to Shelly

¶ 83    Defendant notes that, prior to trial, the State moved pursuant to section 115-10 of the Code to admit *one* hearsay statement, *i.e.*, T.R.'s 2003 statement to Tanya. At trial, however, the State introduced additional hearsay, including T.R.'s statement to Shelly, which was repeated during both T.R.'s and Shelly's testimonies. Specifically, Shelly testified that T.R. said she had asked defendant what he wanted, defendant raised her shirt, and "she said she thought he was going to put his mouth on her breast." T.R., in turn, testified that, after defendant put his mouth on her nipple and she was crying, Shelly asked what happened, and "I told her what he did, and she got really mad and she believed me." Thus, although defendant concedes that section 115-10 permits, for certain sex offenses, the admission of out-of-court statements by the victim in which he or she complained of the act to another, which would otherwise generally constitute inadmissible hearsay (see Ill. R. Evid. 801, 802 (eff. Jan. 1, 2011); 725 ILCS 5/115-10 (West 2018)), he contends that the proponent seeking admission of hearsay pursuant to section 115-10 must disclose its intent to offer the statement and the court must hold a hearing to determine the statement's reliability. 725 ILCS 5/115-10 (West 2018). Here, defendant argues, the State did not seek section 115-10 admission of T.R.'s statements to Shelly, no hearing was held, and no reliability findings were made by the court regarding the statements. As such, defendant argues, defense counsel could have raised a meritorious objection to the hearsay in both Shelly's and T.R.'s testimonies. Further, defendant asserts that counsel should have objected to T.R.'s speculative statement that Shelley "believed" her. Nevertheless, counsel let those statements come in unchallenged, which was unreasonable and prejudicial, because, where defense counsel's theory of the case was that the

events did not happen, the repeated hearsay allegations concerned events that he needed the jury to disbelieve.

¶ 84    The State argues that counsel's failure to object to this testimony was consistent with the defense theory that T.R. misinterpreted defendant's actions, as Shelly's testimony, in full, explained that, after T.R. complained, Shelly confronted defendant, who told her that it was misinterpreted, and he was only blowing on her stomach. When Shelly asked T.R. "did he put his mouth on your breast," she said "no," and Shelly asked T.R., "is it possible that that's what he was going to do. And she said yeah, there was a possibility." The State further contends that, as Shelly did not notify the police or T.R.'s parents, the evidence shows that she did *not* initially believe T.R.'s claims about defendant; accordingly, her testimony supported defendant's trial strategy that the claims were fabricated or misinterpreted.

¶ 85    As to prejudice, the State asserts that there was none from T.R.'s allegedly speculative comment that Shelly "believed" her, because the evidence reflected otherwise. In addition, the State contends that Shelly's testimony concerning what T.R. told her created minimal prejudice, because it was cumulative to T.R.'s own testimony about the circumstances leading up to her claim that defendant lifted her shirt and put his mouth on her breast, as well as what occurred immediately following that offense. Finally, the State asserts that T.R.'s statements to Shelly were potentially admissible under section 115-10, so "defendant cannot establish prejudice from the admission of this evidence where it was likely admissible under that exception." It notes that T.R.'s statements to Shelly were reliable because they occurred right after the event, she had no motive to fabricate them, defendant's statement when confronted corroborated her claim that *something* occurred, and T.R. was subject to cross-examination. In addition, the State claims the statement would have been admissible under the excited-utterance exception to the hearsay rule.

¶ 86     We agree with the State.  Even if counsel's failure to object to the hearsay statements in T.R.'s and Shelly's testimonies was objectively unreasonable, we disagree that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.  Defendant's argument at trial was that the charged events did not occur or, if they did, they were misinterpreted.  While we appreciate defendant's point that the combined testimony told the jury that T.R. did not just tell this story for the first time at trial but, rather, made a prior consistent statement near the time of the event, we agree with the State that Shelly's testimony, in full context, supported defendant's theory that the event was misinterpreted.  Although an event took place, upon hearing defendant's explanation, T.R. *agreed* with Shelly that defendant might simply have been trying to blow on her stomach.  Further, we agree with the State that T.R.'s testimony that Shelly "believed" her did not prejudice defendant; indeed, the testimony reflects that, while Shelly possibly "believed" that something occurred that upset T.R., upon questioning defendant and T.R., the evidence reflected that Shelly thought defendant was only blowing on T.R.'s stomach, she did not tell anyone about the incident, and told defendant only that he could not roughhouse with T.R. any longer.  Finally, regarding T.R.'s testimony that, immediately after the event, she told Shelly about defendant lifting her shirt, we again do not find prejudice that undermines our confidence in the outcome.  Even if counsel should have objected to the hearsay, T.R.'s full testimony explained that, when Shelly confronted defendant, he denied that anything happened, which was consistent with his defense.  As such, defense counsel's failure to object to T.R.'s and Shelly's hearsay testimony, even if unreasonable, does not undermine our confidence in the outcome, and his ineffective-assistance claim on this point fails.

¶ 87                            2. T.R.'s Statements to Police

¶ 88    Next, defendant again notes that only one statement, T.R.'s statement to Tanya in 2003, was litigated pretrial in accordance with section 115-10 of the Code. Yet, at trial, T.R. described in detail the specifics of her statement to police officers, including that defendant put her chest and nipple in his mouth and kissed it, and that she demonstrated with her fingers for police how he touched her vagina. The detective who interviewed T.R. was never called as a witness. Although counsel objected that there was "improper direct testimony," defendant argues that it is simply not clear what objection he was trying to make, and it certainly did not concern section 115-10. This was error, defendant argues, because an objection on specific grounds waives all other grounds of objection. In addition, counsel did not include the issue in a posttrial motion to preserve it for appellate review, which may form the basis of an ineffective-assistance claim. See, *e.g.*, *People v. Brinson*, 80 Ill. App. 3d 388, 393-94 (1980).

¶ 89    The State asserts that the testimony was proper because it was elicited on re-direct examination only after defense counsel highlighted certain omissions and discrepancies between T.R.'s in-court testimony and her statement to police. Specifically, on cross-examination, defense counsel confronted T.R. with the fact that her written statement did not claim that defendant "sucked her nipple." As such, on re-direct, the State tried to clarify the discrepancies between T.R.'s language choice, given that she was 11 years old when she gave her statement, but 26 years old at trial. In any event, the State claims, defendant was not prejudiced because the substance of the statements was properly admitted during T.R.'s testimony.

¶ 90    We agree with defendant. First, it is true that defense counsel used T.R.'s statement to police to defendant's advantage during cross-examination, as she admitted that she did not, in that statement, mention defendant touching her vagina, her "private parts," or sucking her nipple. On re-direct examination, however, the State did not merely inquire about her "word choice" at various

ages.  Rather, it elicited detailed testimony about *how* T.R. described defendant's touching to police, and it prompted her to demonstrate for the jury what she showed police.  Specifically, the State first prompted, "In fact, you described to the detective with your hands, correct?"  T.R. answered, "Yes.  He made me—He had me do a representation of a vagina with my fingers and he had me use my other hand to show how [defendant]'s fingers touched me."  The State then asked her to *demonstrate* how she used her fingers to show the officer.  T.R. responded, "He had me go like this. This is the vagina. These are the lips."  The State summarized, "Your Honor, for the record, the witness is taking her pointer and middle finger and pointing them outward."  T.R. then continued, "Then he had me take these two fingers and I showed him how it went inside in between the lips."  The State summarized, "For the record, the witness took her right hand, her other hand with her two fingers and placed those two fingers between the two fingers on her left hand."  As defendant points out, defense counsel raised no objection to this testimony.  T.R.'s statements to police were hearsay but were never the subject of a section 115-10 motion or hearing. Nor was the officer to whom she gave the statement called at trial.  The State says the evidence was properly admitted during T.R's testimony, but cites no authority making it so.  Indeed, section 115-10 provides that statements and complaints made by the victim to others, including "describing" and providing "detail" about the act, are admissible, but *only if* certain factors are met, including where "[t]he court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability." 725 ILCS 5/115-10(a)(2), (b)(1) (West 2018).  Further, "the proponent of the statement shall give the adverse party reasonable notice of his [or her] intention to offer the statement and the particulars of the statement." *Id.* 115-10(d).  Neither factor was satisfied here.  In any event, "the issue on appeal here concerns *advocacy*, not admissibility." (Emphasis in original.) *Watson*, 2012

IL App (2d) 091328, ¶ 30. We can think of no objectively reasonable strategy for counsel not offering an *objection* to this evidence at trial. Nor can we think of an objectively reasonable reason for counsel's failure to raise the issue in a posttrial motion, so as to preserve it for appellate review. Thus, defendant's argument satisfies the deficient performance prong of an ineffective-assistance claim.

¶ 91 It also satisfies the prejudice prong. We cannot conclude that defendant suffered no prejudice from counsel's failure to object to T.R.'s testimony about how she showed officers defendant penetrated her. Whether and how defendant touched T.R.'s vagina was a critical inquiry, as it supported both the predatory charge of penetration and the aggravated-sexual-assault charge for the touching. The record reflects that the jury was focused on T.R.'s statement to police during its deliberations. It specifically asked to see the statement; the court disallowed it. Indeed, the record reflects that, because T.R.'s written statement lacked allegations about vaginal touching, defense counsel *wanted* the jury to see it, yet he did not object when T.R. testified about what she told police about the touching and her demonstration of what she showed them with her fingers. As such, the jurors were provided a detailed description and visual imagery of T.R. demonstrating for police how defendant touched her, without the counterbalancing written statement reflecting no allegation of vaginal touching. And, while counsel objected at trial to the court's decision not to allow the statement to go back to the jury and raised that issue in a posttrial motion, no objection was raised at trial or posttrial to T.R.'s hearsay about her police statement. As such, we agree that defendant received ineffective assistance of trial counsel, where counsel failed to object to the admission of T.R.'s hearsay testimony regarding her statement to police.

¶ 92                          3. Tanya's Hearsay Statements

¶ 93    Defendant argues next that, prior to trial, the State moved pursuant to section 115-7.3 to introduce only two instances of conduct: defendant kissed C.R. on the mouth and with his tongue, and defendant grabbed D.E.'s breasts. The court overruled counsel's objection and found the incidents admissible, noting that counsel could always move to strike the testimony if the State failed to prove up the allegations. Nevertheless, D.E. was never called to testify. Instead, the evidence concerning D.E. was introduced through Tanya, who did not mention defendant grabbing D.E.'s breasts but, rather, that her mother told her that defendant "tried to rape" D.E. Defendant argues that the testimony was inadmissible, as it constituted double hearsay, and that even grabbing D.E.'s breasts, when she was 23 years old, was insufficiently similar to the charged conduct to warrant admissibility, let alone a claim that he "tried to rape" D.E., an allegation which had no similarity to the charged conduct. Defendant argues that introducing the incident with D.E. was unnecessary because Tanya could have simply testified that she asked T.R. whether defendant had ever touched her inappropriately; no explanation regarding why Tanya asked that question was required. In addition, defendant agrees that counsel objected to the testimony before and during trial ("Objection as to any type of conversation concerning a phone call"); however, despite several potentially meritorious grounds to object, counsel never noted D.E.'s absence from trial, the requirements under section 115-7.3 of the Code that other bad acts be disclosed prior to trial, be similar to that charged, and not unduly prejudicial (see 725 ILCS 5/115-7.3(c), (d) (West 2018)), nor did he take up the court's suggestion to move to strike the testimony if it was not properly proved up, *i.e.*, where D.E. did not testify. Further, when defense counsel objected to the phone-call testimony at trial, the trial court overruled the objection, noting that the testimony of "rape" was admitted for a limited purpose and not for the truth of the matter asserted. However, the jury was never given a limiting instruction. In fact, the only instruction the jury received about other

bad conduct was that it could be considered for the limited purpose of establishing propensity. Finally, defendant notes that counsel did not include this issue in the posttrial motion and, thus, it was not preserved for appeal.

¶ 94     The State argues that Tanya's testimony was not hearsay because it was not offered for the truth of the matter asserted but, rather, to demonstrate her state of mind and why she subsequently asked T.R. about defendant's conduct. It contends that the "brief statement" was offered only for the limited purpose of explaining why Tanya spoke with T.R. and that the court overruled defense counsel's objection to the testimony exactly because it was received for a limited purpose and not for the truth of the matter asserted. To the extent we find admission of the evidence was error or that counsel should have moved to strike the testimony, the State next contends that defendant was not prejudiced because the State did not introduce *additional* testimony about the specific nature of the allegations involving D.E. Indeed, the State contends, D.E.'s absence at trial benefited defendant, because he was able to suggest without her contradiction that the allegations again him were fabricated when he asked D.E. to pay him rent. As such, given D.E.'s absence at trial, the State argues, defendant cannot establish that the one brief statement by Tanya constituted prejudice such that the result of the trial would have been different.

¶ 95     We agree with defendant. The State apparently believes that, if unduly prejudicial statements were brief, there was no damage. Defendant here was charged with committing sex crimes against a child, but the jury heard, for the "limited purpose" of propensity (indeed, an oxymoron), that defendant tried to "rape" an adult. It goes without saying that rape is a violent, egregious crime. Yet it was alleged here against defendant with no prove-up testimony, no similarity between that act against an adult and those alleged against the child victim here (other than D.E. being a family member), and for virtually no purpose. As defendant points out, there

was limited, if any, probative purpose for the evidence; the jury did not need to know Tanya's "state of mind" and reason for asking T.R. questions about defendant. The State's claim that there was no prejudice because it allowed defendant to argue that D.E. was angry over his request that she pay rent is nonsensical. That testimony came from defendant and had nothing to do with Tanya. We agree that defense counsel's failure to raise proper objections to the highly-prejudicial testimony at trial, or to at least raise this issue in the posttrial motion to preserve it for appellate review, was objectively unreasonable. Again, the issue here concerns *advocacy*. See *Watson*, 2012 IL App (2d) 091328, ¶ 30.

¶ 96 Further, we cannot say that there was no prejudice, where the allegation of rape is, itself, prejudicial, and the lack of prove-up testimony or detail could have left the jury speculating about what actually occurred, where the act, at least as it was litigated pretrial at the section 115-7.3 hearing, apparently involved defendant grabbing D.E.'s breasts. Clearly, any probative value about defendant's alleged "rape" of D.E. was outweighed by its prejudicial effect. Moreover, there was no limiting instruction offered, and the jury was instructed that it could consider allegations of other bad conduct to prove defendant's propensity. When coupled with the other allegations of bad acts, such as defendant's alleged anger, violence, and use of a whip, which we address below, the unexplained allegation of rape could only have added to the depiction of defendant as a violent person deserving of punishment. Counsel's failure to raise proper objections to this evidence and to preserve them in a posttrial motion was objectively unreasonable and prejudiced defendant.

¶ 97                    4. Evidence of Defendant's Other Bad Acts

¶ 98 Next, defendant asserts that evidence of prior bad acts is inadmissible if offered only to establish a propensity to commit crime, yet T.R. testified that she did not want to go into the bedroom because defendant scared her, often yelled at Shelly, "always" hit T.R. with a whip, and

made Shelly punish T.R. The State never offered nonpropensity bases for the evidence, nor was the jury ever instructed to consider the evidence for a purpose other than propensity. Indeed, the only instruction the jury received concerning other bad acts was that it *should* consider the evidence for propensity. Defendant also contends the evidence was not relevant because, regardless of why T.R. did not want to go the bedroom, she testified that she *did* go and, so, the jury did not need to hear the prior-bad-acts evidence. He argues that any probative value was far outweighed by prejudicial effect: "[t]he jury simply did not need to know that [he] yelled at his wife and had a whip hanging on his living room wall. Such evidence served only to make him seem like an angry, violent person, who should be convicted regardless of the strength of the State's evidence." In addition, defendant contends that another improperly admitted bad act concerned T.R.'s testimony that she was not going to tell Shelly that defendant put his mouth on her breast because she did not want Shelly to get in trouble, as she knew "he would get violent with her and he would yell at her." Again, defendant argues that there was no reason for the jury to hear this evidence, particularly when, despite her testimony that she did not want to tell Shelly what happened, T.R. *did* immediately tell her what happened. Defendant argues that his counsel should have objected to this evidence, but did not, and the failure constituted deficient performance.

¶ 99 The State responds that the evidence was relevant and admissible to establish T.R.'s state of mind and rebut defendant's claim that any contact that occurred was misinterpreted. Specifically, although defendant claimed that he acted as any uncle does with nieces and that T.R. misinterpreted his actions or his actions were not done for the purpose of sexual gratification, the evidence was relevant to show that T.R. did not perceive her relationship with defendant the way he claimed. Further, the State argues, any prejudice was minimal, as neither T.R. nor the State

elaborated on the allegation that defendant hit her with a whip. Finally, the State asserts the evidence of how defendant treated Shelly was relevant to show why T.R. did not disclose defendant's crimes sooner, and it notes that T.R. did not describe any specific acts of physical violence by defendant towards Shelly, and, therefore, there was no prejudice.

¶ 100 We agree with defendant. The State contends that, even if objectively unreasonable, defense counsel's failure to object to testimony that his client hit T.R. with a whip and was violent with his wife was not prejudicial, because it showed T.R. did not perceive her relationship with defendant the way he characterized it. As defendant notes in reply, this is "just a propensity argument by another name. Essentially, the State is claiming that because [defendant] committed this other, unrelated abuse (hitting T.R. with the whip), he is more likely to have committed the charged crime." Similarly, the State asserts that the evidence concerning defendant's violence with Shelly explained why T.R. did not want to disclose the crimes sooner, but T.R. and Shelly both testified that she *did* immediately disclose one act. In sum, the State cites no authority that there is a proper, nonpropensity purpose for introducing the evidence, which was not disclosed before trial, nor was the jury instructed to consider it for a nonpropensity purpose. There were no limits on the jury's use of information that defendant was violent with Shelly and used a whip on T.R., and, again, it was instructed to consider other bad acts for the purpose of propensity. In closing argument, the State mentioned that T.R. did not want to go see defendant in the bedroom and that she did not want to go because "she didn't want to get that whip." The allegations were not like the charged conduct, were of limited probative value, and any minimal probative value was outweighed but the prejudicial effect. As such, we agree with defendant that counsel's failure to object to the testimony or raise it in a posttrial motion was objectively unreasonable and prejudicial.

¶ 101          5. Elicitation of Damaging Evidence on Cross-Examination

¶ 102   Defendant next points out that, through his cross-examination of C.R., his counsel twice elicited damaging testimony.  First, counsel asked whether, in addition to kissing her, defendant did anything else to her, which resulted in C.R. disclosing for the first time that defendant touched her "butt."  There was no prior disclosure that defendant had ever done anything besides kiss C.R., "[y]et, for no obvious reason, [counsel] engaged in this extended exchange in which C.R. repeatedly stated that [defendant] had touched her butt."  Defendant asserts that counsel either knew of the allegation or violated the first rule of cross-examination by asking a question for which he did not already know the answer.  Later, counsel asked C.R. why she did not reach out to defendant after 2003, and she compared defendant to "the devil."  Defendant argues that asking this question defies common sense; "[t]here is no obvious strategy for asking a child sexual abuse victim why she did not reach out to her abuser."  Moreover, the answer that she called defendant the devil was non-responsive, yet counsel did not move to strike that part of the answer but continued prying about *why* she called him the devil.  Counsel further opened the door for the State on redirect to expound on her answer, and she elaborated that she called him the devil because he took away her innocence.

¶ 103   The State responds that counsel was not ineffective for eliciting these two areas of testimony, as his questions were designed to further the trial strategy that the victims misinterpreted defendant's actions.  As there had been no allegations of sexual penetration involving defendant and C.R., the State contends that counsel's question, "did he do anything else," was intended to demonstrate that nothing more serious occurred.  Further, the State notes that counsel tried to portray her response that he touched her "butt" as just another misinterpreted, normal family contact incident, just as he tried to portray kissing as normal family contact.  The

State asserts that, given the evidence against defendant, counsel's strategy was objectively reasonable. Further, as to the "devil" remarks, the State contends that they were not so prejudicial as to warrant reversal of the conviction. To the extent that counsel was ineffective for failing to object, the State argues that the evidence was not of such a conclusive nature that the result of the trial would have been different.

¶ 104 We agree with defendant. The State's attempt to cast counsel's questions as simply trying to show misinterpretation of defendant's conduct is, at best, a stretch. This issue does not concern counsel's attempts to minimize characterization of *disclosed* charged conduct or conduct deemed admissible by the court before trial (*e.g.*, defendant's open-mouthed kissing of C.R.). This questioning concerns counsel *inviting* a witness to expound on any other *undisclosed* act that may have occurred, and then, in a lengthy examination about the newly raised "butt touching" allegations, bringing the character of that action into play. Counsel smacked his own buttocks in front of the jury, and he elicited testimony in a manner that gave C.R. the opportunity to reiterate that defendant "frequently" touched her "butt," engaged in behavior that was "not normal," he was not teasing, he was not supposed to kiss her in that way, and he spanked and slapped her. As defendant notes, a cardinal rule of cross-examination is to avoid asking a question for which the answer is not already known, and counsel here did so and elicited numerous damaging answers. See, *e.g.*, 4 Lane Goldstein Trial Technique § 19:74 (3d ed.) ("One of the basic 'don'ts' of the cardinal principles of cross-examination involves never asking a question on cross-examination unless you know what the answer will be and that it will be favorable to your side of the case."). We can think of no objectively reasonable strategy for pursuing the initial question or for prolonging the examination. Similarly, we agree that there is virtually no legitimate purpose for counsel to ask a sexual-assault victim whether she reached out to her abuser afterwards and, if not,

then, "why not?" As a result of this question, C.R. repeatedly referred to defendant as "the devil" and explained that defendant stole her innocence. The State asserts that the comments were not particularly prejudicial, yet we think it is commonly known that being compared to the devil is a comparison with "evil." This could only heighten the risk that the jury would impose punishment because it believed defendant to be a bad person. Moreover, the court allowed the State on re-direct to expound on the "devil" comments because *defense counsel* had "opened the door." And the State offers no explanation, let alone an objectively reasonable one, for counsel's failure to object and move to strike the devil comments. Nor did he raise the issue posttrial. We again conclude that counsel's performance was unreasonable and prejudicial.

¶ 105                    6. Cumulative Prejudice from Counsel's Errors

¶ 106   Finally, defendant argues that he was prejudiced by the cumulative effect of counsel's errors. He notes that people tend to believe that which is repeated most often, despite intrinsic merit, so the admission of T.R.'s statements to Shelly and the police were harmful, and counsel should have objected to T.R.'s story being repeated three times. Indeed, he contends, as the jury asked for a copy of T.R.'s statement to police during deliberations, this evidence was on the jury's mind. Further, the evidence that he tried to "rape" D.E., touched C.R.'s "butt," was violent with his wife, and whipped T.R. constituted bad-acts evidence, which carried a high risk of prejudice and was highlighted in the State's closing, yet counsel did not properly object or preserve these issues for appeal. Defendant asserts that the evidence against him was not overwhelming, as he denied every incident, thus it was a credibility contest; T.R. did not disclose the incidents for multiple years; numerous persons lived in the home, but witnessed none of the incidents, including any of the allegedly-frequent open-mouthed kissing; defendant's handwritten statement did not mention any of the charged offenses; and Officer Rivera's memory of the interview, 15 years after

the event, is the only evidence of what occurred therein. Thus, defendant argues, the multitude of trial counsel's errors deprived him of his right to effective assistance. He requests that we reverse and remand for a new trial.

¶ 107   The State disagrees. It contends that the evidence against was overwhelming, given T.R.'s and C.R.'s testimonies, defendant's handwritten statement apologizing for his actions and asking for forgiveness, his admission to police that he lifted T.R.'s shirt and blew on her stomach, and his flight from the jurisdiction and adoption of a new identity. As such, the State contends that none of the alleged errors is so prejudicial that the result of the trial would have been different, and it asks that we reject defendant's ineffective-assistance claims.

¶ 108   As we have concluded that there were several instances of ineffective assistance requiring reversal, we need not delve too deeply into this cumulative argument. We acknowledge that defense counsel faced a challenging case, given the nature of the allegations against defendant, defendant's perceived flight, and the request in his statement for forgiveness. We further acknowledge that counsel's timely and repeated objection to the defective indictment has, in fact, secured a reversal of defendant's predatory-criminal-sexual-assault-of-a-child conviction. However, and as defendant points out, the case against him included a "confession" wherein he mentioned none of the charged conduct, remote allegations, no physical evidence, and a police officer's recollection of an unrecorded interview from more than 15 years prior. As such, it is possible that counsel's mistakes noted above could have tipped the scales to secure defendant's conviction. We reverse and remand for a new trial on the aggravated-criminal-sexual-abuse counts.

¶ 109                                    C. *Krankel* Inquiry

¶ 110   Next, defendant argues that the *Krankel* inquiry into his ineffective-assistance allegations was inadequate. Specifically, defendant notes that, in his written motion and again before the trial

court, he explained that the State had made a plea offer that he had wanted to accept, but his counsel told him that, if he accepted the offer and did not go to trial, he would withdraw from defendant's case. At the *Krankel* hearing, however, the court's questions and counsel's answers established only that there were, indeed, plea negotiations, the offer was communicated to defendant, and the decision to "reject" the offer was jointly made. Yet, defendant argues, none of those claims was inconsistent with his contentions. Indeed, the court simply stopped its inquiry too soon, as it never questioned defense counsel about what happened in his conversations with defendant and what led to the decision to reject the plea. Because the court's inquiry did not touch on the underlying facts of the *pro se* claim, defendant argues the case must be remanded for an adequate *Krankel* hearing.

¶ 111 We need not address this argument. Specifically, defendant raises this argument as an alternative to his first two arguments on appeal. As we have found those arguments successful and are reversing his convictions and remanding for a new trial, we need not also consider the *Krankel* argument.

¶ 112                              D. MSR Term on the Mittimus

¶ 113 Finally, defendant argues that the mittimus must be corrected to comport with the trial court's oral pronouncement of sentence. Specifically, defendant notes that, at sentencing, the court announced that defendant would serve a three-year MSR term. The written sentencing order, however, reflects an MSR term of three years to life. The three-years-to-life MSR term, however, was not enacted until 2005, and, as defendant was charged as having committed offenses between 1996 and 2003, does not apply to him. The State agrees. Nevertheless, we need not address this issue, as we are reversing defendant's convictions and remanding for a new trial.

¶ 114                              III. CONCLUSION

¶ 115   For the forgoing reasons, we reverse the judgment of the circuit court and vacate defendant's predatory-criminal-sexual-assault-of-a-child conviction.

¶ 116   We also reverse defendant's convictions for aggravated criminal sexual abuse and remand those counts for a new trial.  Our reversal raises a double-jeopardy issue, as, unless the first trial presented sufficient evidence to prove defendant's guilt beyond a reasonable doubt, the double-jeopardy clause of the United States Constitution prohibits the State from having yet another opportunity to try its case. See *People v. Sperry*, 2020 IL App (2d) 180296, ¶ 30.  Thus, we are required to consider the sufficiency of the evidence before remanding for a new trial.  *Id.*  Here, defendant does not, on appeal, challenge the sufficiency of the evidence, and his requested relief for the ineffective-assistance claims is that we reverse and remand for a new trial.  We agree that the evidence here, viewed in the light most favorable to the State, is sufficient to support the jury's verdict of guilt beyond a reasonable doubt.  We emphasize, however, that this determination is not binding on remand and does not reflect our opinion on defendant's guilt or innocence.

¶ 117   For the reasons stated, the judgment of the circuit court of Lake County is reversed and remanded for proceedings consistent with this order.

¶ 118   Reversed and remanded.